IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| PATRICK HIGGINS,<br><br>        Plaintiff,<br><br>  vs.<br><br>FIRST HORIZON NATIONAL<br>CORP, et al.,<br><br>        Defendants. | **CV-15-101-GF-BMM**<br><br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

The Court heard this matter, sitting without a jury, on March 8, 2017, in Great Falls, Montana. Helge Naber represented Plaintiff Patrick Higgins ("Higgins"). Michelle Sullivan and Adrian Miller represented Defendants First Horizon National Corporation, Nationstar Mortgage Holding Inc., and Metlife Home Loans LLC (collectively "Defendants"). The Court twice ordered the parties to participate in settlement conferences after the trial. Both efforts failed to resolve the dispute.

Having heard the evidence and reviewed the trial briefs of both parties, the Court makes the following:

1

# FINDINGS OF FACT

1. The events leading to this action took place primarily in Cascade County, Montana.

2. Higgins brought claims against Defendants on April 21, 2014, in the Eighth Judicial District Court, Cascade County, Montana.

3. Defendants removed the action to this Court on November 13, 2015.

4. Higgins alleged various violations of Montana's Consumer Protection Act, § 30-14-101, et seq., several breaches of the covenant of good faith and fair dealing, and unjust enrichment.

5. Higgins contends that Defendants improperly handled a forbearance agreement that he entered with First Horizon Home Loans in 2009. Higgins alleges in his Complaint, in part, that Defendants provided the wrong payment address related to a forbearance agreement that the parties attempted to enter in 2009.

6. Higgins alleges that Defendants violated the covenant of good faith and fair dealing when Defendants failed to credit properly payments that Higgins attempted to tender to First Horizon Home Loans under the forbearance agreement. Higgins further alleges that First Horizon Home Loans failed to comply with its obligations under the forbearance agreement.

7. Higgins alleges that Defendants violated the Montana Consumer Protection Act relating to conduct surrounding a foreclosure sale that Defendants threatened in 2012. Defendants had sent Higgins a notice of a foreclosure sale scheduled for March 26, 2012. Higgins attempted to stave off the foreclosure sale through a loan modification. Higgins contends that Defendants refused to cancel the foreclosure sale as required by the loan modification program once he had filed a completed application with the accompanying financial information on March 14, 2016. Higgins contends that Defendants instead continued to threaten to proceed with the foreclosure sale unless Higgins reinstated his loan obligations. Higgins argues that these improper actions by Defendants wrongly coerced him into mailing a payment of $187,823.13, on March 16, 2012.

8. Higgins's unjust enrichment claim arises from these same two events.

9. Defendants denied all of the allegations in Higgins's complaint. Defendants asserted an affirmative defense under the statute of limitations with respect to the Montana Consumer Protection Act claims.

10. Defendants also claimed that Higgins had named as defendants several parties who played no role in these events. Defendants filed a motion before trial to dismiss a number of these parties. The Court took the matter under advisement.

11. The parties presented evidence at trial related to the two central disputes of the bungled forbearance agreement in 2009 and the run-up to the foreclosure sale scheduled for March 26, 2012.

**Events in 2006**

12. Higgins purchased 870 acres of property in Cascade County. Higgins recorded a Warranty Deed dated October 17, 2006, as Document No. R0138008 in the records of the Cascade County Clerk & Recorder. Higgins took out a loan from Rocky Mountain Bank to finance the purchase.

13. Higgins signed a loan application to secure financing from First Horizon Home Loan Corporation for a house and 20 acres of the 870-acre parcel on November 13, 2006. The Rocky Mountain Bank loan would secure the remaining 850 acres of Higgins's 870 total acres.

14. Higgins executed a promissory note in favor of First Horizon Home Loan Corporation in the principal amount of $395,000.00 on November 13, 2006. The promissory note required monthly payments of principal and interest of $2,761.90 over a 30-year period. The promissory note also required Higgins to make payments each month to an escrow account to cover taxes, insurance, and mortgage insurance. The escrow payment brought Higgins's total monthly payments for the promissory note to $4,041.16.

15. Higgins also executed a deed of trust to secure repayment of the promissory note on November 13, 2006. The deed of trust encumbers a 20-acre parcel of land that includes a house and out buildings. The 20-acre parcel and the out buildings formerly had been attached to the 870 acres transferred by the Warranty Deed dated October 17, 2006.

16. The resulting 20-acre parcel is identified as follows:

> A tract of land in the E1/2E1/2 of Section 21 and the W1/2W1/2 of Section 22, Township 19 North, Range 2 West, M.P.M., Cascade County, Montana, described as follows:
>
> Commencing at the N1/4 of Section 20, Township 19 North, Range 2 West, M.P.M., which is a found stone as described in the original GLO notes; thence N89°50'55"E, along the record North line of Section 20 and 21 a distance of 7958.61 feet to the Northeast Corner of Section 21; thence S00°24'42"E, a distance of 2640.04 feet along the record East line of Section 21 to the E1/4 of said Section 21; thence S00°24'42"E along said East line a distance of 675.39 feet to a point on said East line of Section 21, that point being the point of beginning of the parcel herein described;
> Thence along the North right-of-way of a county roadway N68°35'57"W, a distance of 296.99 feet to the P.C. of a curve; thence along a circular curve, concave south with a central angle of 15°18'12", a radius of 712.00 feet, an arc distance of 190.17 feet; thence N35°25'21"E, a distance of 777.69 feet; thence N90°00'00"E, a distance of 899.60 feet; thence S00°00'00"E, a distance of 785.72 feet; thence S89°48'44"W, a distance of 854.35 feet to the point of beginning. According to Certificate of Survey No. S-0004426M.

The above-described parcel is hereafter referred to as the "Property".

17. Higgins recorded the deed of trust identified above (hereafter referred to as the "Deed of Trust") as Document No. R0138012 in the records of the

Cascade County Clerk & Recorder on November 15, 2006. The Court will refer to the Deed of Trust and the promissory note hereafter collectively as the "Loan."

18. Similar to many mortgages issued during this period, First Horizon Home Loan Corporation sold the loan on the secondary market to Federal National Mortgage Association ("Fannie Mae") at some point shortly after the loan originated. This sale introduced many new parties to this saga, including lenders, loan servicing companies, and various subsidiaries of these companies. These other parties include the following: First Horizon Home Loan Corp., First Tennessee Bank National Association, Metlife Home Loans, Nationstar Mortgage Holdings, Inc., and Nationstar Mortgage LLC.

19. Fannie Mae constitutes a government sponsored enterprise ("GSE"). The Fannie Mae Single Family 2012 Servicing Guide governed the servicing of Higgins's Loan in 2012.

20. Higgins's loan with Rocky Mountain Bank to finance the original purchase of the 870-acre parcel had closed before Higgins received the loan from First Horizon Home Loan Corporation. Higgins did not disclose the monthly loan payment owed to Rocky Mountain Bank on his application for the loan from First Horizon Home Loan Corporation.

21. Defendants presented evidence at trial regarding Higgins's apparent failure to disclose his financial obligations under the loan with Rocky Mountain Bank at the time that he closed on the Loan at issue. Defendants presented this evidence in an attempt to demonstrate that Higgins's alleged omission constituted a breach under the terms of the Loan that would have disqualified him for the Loan, as well as any programs to modify the terms of the Loan under a variety of programs that emerged during the time period in question.

22. The Deed of Trust includes the following language at Section 8 of that document:

> Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.

23. The Court finds no need to resolve the question of whether Higgins failed to disclose the existence of the Rocky Mountain Bank loan at the time that he obtained the Loan at issue and whether this omission constituted a material breach of the terms of the Loan. The record indicates that Defendants took no steps to foreclose on Higgins's Loan based upon the alleged omission. The record further indicates that Defendants' refusal to modify Higgins's Loan, either through the forbearance agreement or any other programs,

related in no way to their discovery of Higgins's alleged omission. The evidenced developed at trial instead shows that Defendants possessed no knowledge of Higgins's alleged omission until preparing for trial in this matter in late 2016 and early 2017.

**Events in 2007**

24. Higgins paid on the Loan as promised for the remainder of 2007.

**Events in 2008**

25. Higgins fell a payment or two behind on his Loan by May 2008.

26. First Horizon Home Loans and Higgins communicated regarding the Loan in 2008. First Horizon Home Loans initiated foreclosure proceedings on the Property in November 2008.

27. Higgins sent a cashier's check payable to Metlife Home Loans LLC in the amount of $26,066.56, on or about December 22, 2008. Metlife Home Loans LLC subserviced Higgins's loan on behalf of First Horizon Home Loans at that time.

28. Higgins's $26,066.56 payment fully reinstated his loan and successfully avoided a foreclosure sale of the Property. Higgins's payments on the Loan remained current at the end of 2008.

**Events in 2009**

29. Higgins fell two months behind on his loan payments by February 2009.

30. First Horizon Home Loans sent a letter to Higgins dated June 19, 2009. The letter informed Higgins that he had been denied a modification pursuant to the Home Affordable Modification Program. (Doc. 78-8.)

31. First Horizon Home Loans informed Higgins in the same letter, however, that he could participate in the HomeSaver Forbearance program. The letter explained that Higgins would be required to make reduced monthly payments for up to six months. First Horizon Home Loans further informed Higgins that it would "work with" him "to find a long-term solution that allows you to avoid foreclosure." *Id.*

32. First Horizon Home Loans directed Higgins to notify it by July 3, 2009, whether he agreed to participate in the forbearance program. The letter directed Higgins to sign and return "the enclosed Forbearance Agreement no later than 07/03/2009." *Id.*

33. The letter further directed Higgins to include with the signed Forbearance Agreement "his first monthly payment as established by the Forbearance Agreement." *Id.* The attached Forbearance Agreement identified the first of six equal payments of $2,275.57, to be paid by July 19, 2009. (Doc. 78-9)

34. Higgins testified that he never received the Forbearance Agreement until September 10, 2009. The record contains no definitive evidence as to the date that Higgins received the Forbearance Agreement.

35. All parties agree that Higgins signed the HomeSaver Payment Forbearance Agreement ("Forbearance Agreement") on September 11, 2009. (Doc. 78-9.) Higgins returned the executed Forbearance Agreement that same day along with a check intended to cover one of the six payments contemplated under the Forbearance Agreement.

36. First Horizon Home Loans finally executed the Forbearance Agreement on September 21, 2009, after it had received the signed agreement from Higgins. Confusion exists as to what caused the apparent delay in Higgins receiving the Forbearance Agreement.

37. All parties agree that Higgins sent three payments to First Horizon Home Loans in an attempt to comply with the Forbearance Agreement. All parties agree that First Horizon Home Loans received these payments and returned all three checks to Higgins. The record contains no evidence that Higgins sent any of the three attempted payments to the wrong address.

38. The Forbearance Agreement required Higgins to make a payment of $2,275.57 by July 19, 2009. Despite not yet having received the Forbearance Agreement, Higgins sent First Horizon Home Loans a payment under the Forbearance Agreement of $2,020.58 by check dated August 1, 2009. Higgins testified that he sent this check based upon advice that he received

in a series of telephone calls with representatives of First Horizon Home Loans.

39. First Horizon Home Loans returned this payment to Higgins with a letter dated August 17, 2009. The letter informed Higgins that the payment had been returned as untimely as the first payment had been due on "06/29/09." (Doc. 78-20.) This attempted payment also fell $254.99 short of the $2,275.57 payment required under the terms of the Forbearance Agreement.

40. The Forbearance Agreement required Higgins to make a second payment of $2,275.57 by August 1, 2009. Higgins testified that he did not receive the Forbearance Agreement, of course, until September 10, 2009. Higgins testified that he immediately executed the Forbearance Agreement and returned to First Horizon Home Loans on September 11, 2009, with a check in the amount of $2,275.57. First Horizon Home Loans returned this payment to Higgins along with a letter dated September 24, 2009. The letter informed Higgins that his check was being returned as "[p]lan broke in July." (Doc. 78-21.)

41. The Forbearance Agreement required Higgins to make a third payment of $2,275.57 by September 1, 2009. Higgins sent First Horizon Home Loans a third payment of $2,275.57 by check dated October 21, 2009. First Horizon

Home Loans returned this payment to Higgins in a letter dated October 26, 2009. The letter failed to specify a reason for the return. (Doc. 78-22.)

42. Higgins sent no further payments to First Horizon Home Loans under the Forbearance Agreement.

43. The Forbearance Agreement required First Horizon Home Loans to "suspend any scheduled foreclosure sale" during the deferral period. The Forbearance Agreement defined the "deferral period" as ending on the earlier of (i) January 1, 2010; (ii) upon the execution of an agreement for another resolution of Higgins's default under the Loan, such as a modification, a pre-foreclosure sale, or a deed-in-lieu of foreclosure; or (iii) Higgins's default under the Forbearance Agreement. (Doc. 78-9 at 2.)

44. First Horizon Home Loans took no steps to foreclose on the Property before January 1, 2010. The record contains no evidence that Higgins and First Horizon Home Loans executed any agreement to resolve Higgins's default under the Loan during the deferral period.

45. The Forbearance Agreement also required First Horizon Home Loans to "review Higgins's Loan to determine whether additional default solution assistance" could be offered to Higgins. *Id.*

46. The Forbearance Agreement expressly provided that one of the following outcomes would ensue at the end of the six-month deferral period: (1)

Higgins would be required to recommence his regularly scheduled payments and to make additional payments, on terms to be determined by First Horizon Home Loans, until all past due amounts owed under the Loan documents have been paid in full; (2) Higgins would be required to reinstate his loan in full; (3) First Horizon Home Loans would offer to modify Higgins's Loan; (4) First Horizon Home Loans would offer Higgins some other form of payment assistance or alternative to foreclosure, on terms to be determined solely by First Horizon Home Loans with the approval of the investor or insurers on Higgins's Loan; or (5) if no feasible alternative could be identified, First Horizon Home Loans could commence or continue foreclosure proceedings or exercise other rights and remedies provided First Horizon Home Loans under the Loan Documents. *Id.* at 2-3.

47. Higgins's Complaint focused on Defendants' alleged failure to identify a long-term solution to his struggle to make the required monthly payments under the original Loan. Higgins admitted that the Forbearance Agreement permitted him to make discounted monthly payments of $2,275.57 for six months as opposed to the $2,761.90 monthly payment of principal and interest required under the Loan.

48. As discussed in Paragraph 37, Higgins attempted to make three payments during the deferral period under the Forbearance Agreement. First Horizon

Home Loans returned all three checks – nearly $6,600 – that Higgins attempted to pay.

49. Higgins argues that First Horizon Home Loans' decision to return these three payments, and not accept the remaining three payments required under the Forbearance Agreement, left him further in arrears. Higgins seems to argue that he could have stayed current on the Loan after the deferral period if First Horizon Home Loans had accepted the three attempted payments. Nothing in the record establishes why the parties did not execute the Forbearance Agreement until September 11, 2009.

50. The record further establishes that First Horizon Home Loans returned all three checks to Higgins. Higgins does not allege that First Horizon Home Loans misapplied these payments. It appears, therefore, that Higgins remained free to use these funds to make payments on the Loan after the default period in the Forbearance Agreement.

51. Higgins submitted a hardship letter to First Horizon Home Loans on November 6, 2009. Higgins asked First Horizon Home Loans to lower his monthly mortgage payments in "these tough economic times." Higgins explained the decrease in his income from 2007 through 2009. (Doc. 78-24.)

52. Higgins sent another letter on December 3, 2009, along with a profit and loss statement, expense statement, and other information to further support

his request for assistance. Higgins's letter expressly noted that he had provided a profit and loss statement "per phone call with Cynthia on 23 Nov 2009." (Doc. 78-25.)

53. First Horizon Home Loans did not approve Higgins's Loan for any type of modification in late 2009 or early 2010.

54. By its terms, the Forbearance Agreement expired on January 1, 2010. The Forbearance Agreement did not forgive any payments on Higgins's Loan. The Forbearance Agreement did not modify Higgins's Loan, the promissory note, or the Deed of Trust.

55. First Horizon Home Loans argues that it fulfilled its obligations under the terms of the Forbearance Agreement when it refrained from seeking to foreclose Higgins's Loan during the six-month deferral period. The Court finds that First Horizon Home Loans took no steps to foreclose on Higgins's Loan before January 1, 2010.

56. First Horizon Home Loans admitted that it did not offer Higgins any further default assistance as contemplated by Paragraph 2(C) of the Forbearance Agreement. As the record indicates, however, it does not appear that either party performed under the terms of the Forbearance Agreement. Higgins attempted to make only three of the six required payments. First Horizon Home Loans returned all three of Higgins's attempted payments.

## Events in 2010

57. Higgins made no payments on the Loan in 2010.

## Events in 2011

58. Higgins and his wife, Jeanine, executed a Buy/Sell Agreement for the Property on March 2, 2011. The Buy/Sell Agreement listed the intended purchaser of the Property listed as "Steven Boettger, LLC." Steven Boettger is the son of Jeanine Higgins. The Buy/Sell Agreement listed the sale price as $325,000.00. (Doc. 78-10.)

59. First Horizon Home Loans approved a short sale of the Property to Steven Boettger, *individually*, for $325,000.00 on or about March 10, 2011. (Doc. 78-11.) The sale did not go through. Higgins presented no evidence that First Horizon Home Loans, or any Defendants, interfered in the completion of this attempted short sale.

60. First Horizon Home Loans approved a short sale of the Property to Paul Feikert for $325,000.00 on or about April 26, 2011. (Doc. 78-12.) The sale did not go through. Higgins presented no evidence that First Horizon Home Loans, or any Defendants, interfered in the completion of this attempted short sale.

61. Nationstar Mortgage LLC assumed responsibility for servicing Higgins's Loan on August 1, 2011.

62. Higgins had not made a payment since December 2008 at the time that Nationstar Mortgage LLC took over servicing Higgins's Loan. Higgins was overdue on the Loan on August 1, 2011, for all 12 payments in 2009, all 12 payments in 2010, and eight payments in 2011.

63. Higgins's scheduled monthly payments on the Loan between January 1, 2009, and August 1, 2011, should have been $4,041.16. This total included $2,761.90 in monthly principal and interest payments as contemplated by the Note, and $1,279.26 in escrow expenses.

64. The amount overdue on the Loan totaled $159,281.20 on August 1, 2011. This overdue amount included the following: the 32 payments of $4,041.16, for principal, interest, and escrow, for a total of $129,317.12; $24,930.25 in additional escrow advances; $4,315.23 in corporate advances; and $718.60 in late charges.

65. In November 2011, Nationstar Mortgage LLC scheduled a trustee's sale of the Property to take place on March 26, 2012.

**Events in 2012**

66. Higgins apparently communicated by telephone with Nationstar Mortgage LLC employees in early 2012 about a possible short sale. Higgins also raised the issue of a potential loan modification.

67. Higgins understood at that time that foreclosure sale would occur if Northstar Mortgage LLC did not approve the short sale or the loan modification.

68. Higgins owed $387,434.74 in principal on January 17, 2012. Higgins owed another $88,068.19 in accrued interest. Higgins stood 37 payments behind on the Loan by January 17, 2012.

69. Higgins acknowledged that Nationstar Mortgage LLC had no obligation to approve a short sale of the Property at the terms that he requested.

70. Nationstar Mortgage LLC's loan notes reflect that Higgins spoke with Nationstar Mortgage LLC on January 30, 2012, about a possible loan modification. Higgins agreed in the conversation to send a packet of financial documentation to Nationstar Mortgage LLC by February 2, 2012.

71. Nationstar Mortgage LLC reviewed the documents from Higgins on February 6, 2012. Higgins failed to include pay stubs and bank statements in the financial documents.

72. Higgins's financial package apparently remained incomplete on February 13, 2012. Nationstar Mortgage LLC informed Higgins that it still needed Higgins's two most recent pay stubs, a pension award letter, and two bank statements that would show deposits of Higgins's pension. (Doc. 73 at 14-15.)

73. Higgins had not provided the missing information to Nationstar Mortgage LLC by February 22, 2012. Northstar Mortgage LLC informed Higgins that it would not consider a loan modification request for Higgins until it received this information. (Doc. 73 at 15.)

74. Nationstar Mortgage LLC's loan notes reflect that it informed Higgins on February 23, 2012, that his income did not support a loan modification. Nationstar Mortgage LLC informed Higgins that his actual income would need to be double what he reported in order to qualify for a modification. The loan notes further reflect that Nationstar Mortgage LLC told Higgins that his debt-to-income ratio exceeded 100%. Higgins claimed in response that he may have understated his income. *Id.*

75. Nationstar Mortgage LLC received documentation from Higgins for a loan modification on March 7, 2012. The loan notes reflect that Higgins sent bank statements to Nationstar Mortgage LLC on March 7, 2012. Higgins failed to provide, however, his profit-and-loss statements for his farming and real estate income for the last quarter, or for the year-to-date. *Id.*

76. Nationstar Mortgage LLC sent a letter to Higgins on March 7, 2012. (Doc. 62-19.) The letter indicated that Nationstar Mortgage LLC would strive to expedite the request if Higgins submitted a complete Borrower Response Package ("BRP") fewer than 37 days before a scheduled foreclosure sale

date. The letter explained that no guarantee existed, however, that Nationstar Mortgage LLC would be able to complete the evaluation in time to stop the scheduled foreclosure sale. *Id.*

77. Nationstar Mortgage LLC previously had scheduled the foreclosure sale for the Higgins Property on March 26, 2012. This date fell 19 days after Higgins had provided the incomplete loan modification paperwork to Nationstar Mortgage LLC.

78. Nationstar Mortgage LLC received Higgins's profit-and-loss statement, along with a letter from United States Senator Jon Tester on March 14, 2012. Higgins testified that a Nationstar Mortgage LLC agent, Mr. Fernandez, informed him in a telephone conversation that the foreclosure sale would proceed as scheduled unless Higgins made a full payment to reinstate the Loan.

79. Higgins called Nationstar Mortgage LLC on March 16, 2012, to confirm its receipt of the profit-and-loss statement. Higgins further advised Nationstar Mortgage LLC of the "need to bump this up a couple of notches" due to the fact that "we are dealing with the Senator here." Higgins further highlighted his approaching foreclosure sale date of March 26, 2012. (Doc. 73 at 16.)

80. Nationstar Mortgage LLC's loan notes reflect that Higgins indicated that he would be sending a check for $187,823.13 to Nationstar Mortgage LLC.

Higgins contends that Nationstar Mortgage LLC's receipt of his completed loan modification package on March 14, 2012, should have triggered the requirement under the Making Home Affordable program that Nationstar Mortgage LLC suspend the scheduled foreclosure sale. *Id.*

81. As noted in Paragraph 75, however, Nationstar Mortgage LLC informed Higgins that he had failed to include his recent profit-and-loss statement for his farming and real estate income. Higgins finally provided the missing information on March 14, 2016 – twelve days before the scheduled foreclosure sale. Nationstar Mortgage LLC cited to its letter of March 7, 2012, in which it explained its inability to complete a full review in such a shortened time frame. (Doc. 62-19.)

82. Nationstar Mortgage LLC declined to suspend the foreclosure sale until Higgins had paid the entire reinstatement amount.

83. Higgins reinstated his loan when he sent a cashier's check to Nationstar Mortgage LLC on March 16, 2012. Higgins sold some of his remaining land not subject to this action in order to raise sufficient funds. Nationstar Mortgage LLC finally cancelled the foreclosure sale after it received the cashier's check from Higgins on March 20, 2012.

84. Higgins contends that this reinstatement amount had been inflated due to Defendants' wrongful failure to accept the three payments that he had attempted to make back in 2009 as part of the Forbearance Agreement.

85. The Deed of Trust executed by Higgins provides for the application of loan payments as follows:

> 2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Notes; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

86. Nationstar Mortgage LLC applied Higgins's payment of $187,823.13 as follows: $148,377.51 to 40 missed payments (in turn allocated to principal in the amount of $15,416.26; interest in the amount of $95,059.74; and escrow in the amount of $37,901.51); $6,104.50 to late charges; $4,437.23 for corporate advances; and $28,903.89 to additional principal payment. The $187,823.13 payment applied in accordance with the terms of the Deed of Trust as set forth above.

87. Higgins offered no evidence to show Nationstar Mortgage LLC improperly applied his payment, or that the payment should have been applied differently, or contrary to the terms of the Loan. Higgins simply suggests that the amounts in arrears would have been less had Defendants accepted

his attempted payments in 2009 during the deferral period of the Forbearance Agreement. As noted in Paragraph 48, however, it appears that Higgins retained the nearly $6,600.00 that he attempted to pay under the Forbearance Agreement. Higgins should have been able to use these same funds to make part of the reinstatement amount.

88. Higgins owed $343,114.58 in principal following the $187,823.13 payment.

89. Nationstar Mortgage LLC cancelled the foreclosure sale set for March 26, 2012, after Higgins had reinstated the Loan with the $187,823.13 payment.

90. Nationstar Mortgage LLC finally denied Higgins's application for Making Home Affordable ("MHA") relief in a letter dated June 26, 2012. (Doc. 62-21.) The letter noted that Higgins remained current on his mortgage loan at that time. Nationstar Mortgage LLC offered no explanation for the apparent delay in notifying Higgins of his ineligibility for relief under the MHA.

91. The record contains no evidence of whether the information that Higgins provided to Nationstar Mortgage LLC on March 14, 2016, should have been sufficient to halt or delay the foreclosure sale scheduled for March 26, 2016.

92. The Court finds that Nationstar Mortgage LLC's notification of Higgins's ineligibility for relief under the MHA June 26, 2012, constitutes the last act alleged by Higgins that violated the Montana Consumer Protection Act. This act falls within the two-year statute of limitations under Montana law as

Higgins filed his Complaint on April 21, 2014. *See* Mont. Code Ann. § 27-2-211.

93. Nationstar Mortgage LLC reviewed the financial information that Higgins provided. Nationstar Mortgage LLC determined that Higgins had failed to document financial hardship that reduced his income or increased his expenses. Nationstar Mortgage LLC determined that Higgins lacked sufficient net income to pay his current mortgage payment. Nationstar Mortgage LLC further determined that Higgins possessed the ability to pay his current mortgage payment by the use of his cash reserves or other assets.

94.  Higgins remained current on his loan payments through November 2012.

**Events in 2013**

95. Higgins owed $338,710.67 in principal on January 20, 2013.

96. Nationstar Mortgage LLC initially recommended that it initiate foreclosure proceedings on the Property in June 2013. Nationstar Mortgage LLC apparently halted the foreclosure sale when it determined that Higgins could qualify for an alternative modification program.

97. Higgins qualified for an alternative modification program on August 26, 2013. His first modified payment under the trial plan was due by September 1, 2013. Higgins timely made all three of his modified payments under the trial plan in the fall of 2013.

98. Higgins executed the Loan Modification Agreement on November 27, 2013. (Doc. 78-18.) The Loan Modification Agreement provided that the unpaid principal balance of the loan would be $373,920.00. The Loan Modification Agreement required Higgins to begin making monthly principal and interest payments in the amount of $1,562.76 on January 1, 2014. *Id.* Higgins testified that he would have accepted this same modification program in 2009 if it had been offered to him at that time.

99. Nationstar Mortgage LLC executed the Loan Modification Agreement on November 30, 2013. *Id.*

**Events in 2014**

100. Higgins made one $1,562.76 payment on the Loan pursuant to the terms of the Loan Modification Agreement on February 1, 2014. Higgins's Loan again went into default under the Loan Modification Agreement.

101. Higgins acknowledged in early 2014 that he had fallen behind on Loan payments. Higgins reported to Nationstar Mortgage LLC that he had listed the Property for sale. The Loan had an unpaid principal balance of $373,228.64 by 2014.

102. Higgins paid the following amounts on the Loan:

| 2006 | 3 payments | $4,4041.16 | $12,123.48 |
| 2007 | 12 payments | $4,041.16 | $48,493.92 |

| 2008 | 3 payments | $4,041.16 | $38,190.04 |
|---|---|---|---|
| | 1 payment | $26,066.56 | |
| 2011 | 4 payments | $4,041.16 | $16,164.64 |
| 2012 | 1 payment | $187,823.13 | $187,823.13 |
| 2013 | 3 payments | $1,562.76 | $4,688.28 |
| 2014 | 1 payment | $1,562.76 | $1,562.76 |
| TOTAL | | | $309,046.25 |

Defendants applied these amounts pursuant to the terms specified in the Loan and the Loan Modification Agreement.

## CONCLUSIONS OF LAW

1. The Court possesses jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332(a).

2. Venue is proper in the Great Falls division pursuant to 28 U.S.C. § 1391(b)(2), as the property in question sits in Cascade County and Cascade County falls within the Great Falls Division.

**Breach of the Covenant of Good Faith and Fair Dealing**

3. Every enforceable contract "contains an implied covenant of good faith and fair dealing." *Knucklehead Land Co., Inc. v. Accutitle, Inc.*, 2007 MT 301, ¶ 18, 340 Mont. 62, 172 P.3d 116. Higgins's Loan and accompanying

promissory note constitute enforceable contracts under Montana law. The Loan and promissory note contain an accompanying "implied covenant of good faith and fair dealing." *Id.*

4. The covenant constitutes a "mutual promise implied in every contract that the parties will deal with each other in good faith, and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." *Phelps v. Frampton,* 2007 MT 263, ¶ 29, 339 Mont. 330, 170 P.3d 474.

5. The standard of conduct imposed by the implied covenant maintains "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *McCoy v. First Citizens Bank*, 2006 MT 307, ¶ 21, 335 Mont. 1, 148 P.3d 677.

6. Higgins alleged in his Complaint that Defendants had provided him "with a false payment address" to send his payments under the Forbearance Agreement. The evidence indicated, however, that Defendants received Higgins's three attempted payments under the Forbearance Agreement.

7. In fact, Defendants returned each of the three attempted payments in separate letters that explained the reason for the refusal of the payment. As these letter explain, Higgins's first attempted payment fell short of the amount stated in the Forbearance Agreement. This first attempted payment by

Higgins, along with the second and third attempted payments, also was received late by First Horizon Home Loans.

8. The record fails to establish why Higgins returned the signed Forbearance Agreement in September 2009. Neither party offered any evidence to explain clearly the delay between when First Horizon Home Loans sent the Forbearance Agreement to Higgins on June 19, 2009, and Higgins's apparent acceptance of the Forbearance Agreement on September 11, 2009.

9. Defendants have not violated the implied covenant of good faith and fair dealing under these circumstances.

**Montana Consumer Protection Act**

10. To prove his Montana Consumer Protection Act claim under the Montana Consumer Protection Act, Higgins must prove the following elements:

   a. That he should be considered a consumer as defined in Mont. Code Ann. § 30-14-102(1);

   b. That he suffered an ascertainable loss of money or property, real or personal; and

   c. That the loss of money or property existed as a result of the use or employment by another person of a method, act, or practice declared unlawful by Mont. Code Ann. § 30-14-103.

11. Section 103 declares unlawful "unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce." Mont.
Code Ann. § 30-14-103.

12. An unfair act or practice offends established public policy and constitutes an
act or practice deemed either immoral, unethical, oppressive, unscrupulous
or substantially injurious to consumers. *Rohrer v. Knudson*, 2009 MT 35, ¶
31, 349 Mont. 197, 205, 203 P.3d 759, 764.

13. Higgins offers no evidence that any of the Defendants acted in a way that
"offends established public policy or in a way that should be considered
either immoral, unethical, oppressive, unscrupulous or substantially injurious
to consumers."

14. Higgins alleged that Defendants violated the Montana Consumer Protection
Act when they refused to cancel the foreclosure sale scheduled for March 26,
2012, even after he had submitted his complete package of financial
information on March 14, 2012. He testified that the submitted the
$187,823.13 only after Defendants continued to threaten to proceed with the
foreclosure sale unless Higgins tendered the full amount of the deficiency.

15. Higgins offered no evidence that any of the Defendants acted in a manner
that breached the Montana Consumer Protection Act. As the letter of March
7, 2012, from Nationstar Mortgage LLC to Higgins explained, Nationstar
Mortgage LLC could not guarantee that it would be able to suspend the

scheduled foreclosure sale if he submitted his financial information fewer than 37 days before the March 26, 2012, foreclosure sale. Higgins submitted his complete financial information on March 14, 2012.

16. The Fannie Mae Single Family 2012 Servicing Guide governed the servicing of Higgins's Loan in 2012. Servicers must acknowledge to the borrower the receipt of a BRP.

17. This acknowledgment by loan servicers must include the following information:

    a. The servicer's evaluation process and response time frame;

    b. An explanation of the foreclosure process, including an explanation that the foreclosure process may continue during the evaluation, and that foreclosure referral will not occur if the servicer reviews a complete BRP or has extended an offer and the borrower's response time for acceptance has not lapsed;

    c. For borrowers who submit a complete BRP fewer than 37 days before a scheduled foreclosure sale, an explanation of the servicer's plan for evaluating the borrower for a foreclosure prevention alternative and suspending the foreclosure sale, if appropriate; and

    d. Appropriate disclosures required by applicable federal, state, or local law.

*See* Fannie Mae Single Family 2012 Servicing Guide,

https://www.fanniemae.com/content/guide/svc031412.pdf, at p. 702-12.

18. The Fannie Mae Single Family 2012 Servicing Guide provides that the "servicer may, but is not required to," send an Incomplete Information Notice to a borrower who submits incomplete documentation fewer than 37 days before a scheduled foreclosure sale. *Id.* at 702-14.

19. Higgins did not provide a complete BRP more than 37 days before the scheduled March 26, 2012, foreclosure sale. Higgins would not have been entitled to, or guaranteed, an evaluation of the materials that he submitted on March 14, 2012, or of his loss of mitigation options.

20. Higgins offered no evidence of an ascertainable loss of money or property as the result of the actions of any of the Defendants related to their refusal to cancel the foreclosure sale until Defendants had received Higgins's payment on March 20, 2012. The Court cannot determine that Defendants violated the Montana Consumer Protection Act when they refused to guarantee to Higgins that submission of his completed package of financial information on March 14, 2012, twelve days before the scheduled foreclosure on March 16, 2012, would halt the foreclosure sale.

21. Higgins's claim for breach of the Montana Consumer Protection Act fails.

## Unjust Enrichment

22. Finally, the evidence shows that Defendants properly have accounted for all payments that Higgins submitted. The evidence further indicates that Defendants properly have applied every payment submitted by Higgins pursuant to the terms of the Loan.

23. Higgins has failed to demonstrate that Defendants have been unjustly enriched as a result of their conduct. Higgins's claim for unjust enrichment fails.

## Motion to Dismiss

24. The Court finds no need to address Defendants' pending motion to dismiss a number of parties, including First Horizon National Corp and Nationstar Mortgage Holding, Inc. Higgins has failed to set forth sufficient evidence to support a finding of liability for any of the Defendants under the implied covenant of good faith and fair dealing, Montana's Consumer Protection Act, or a theory of unjust enrichment.

## JUDGMENT & ORDER

1. The Court hereby enters judgment on behalf of Defendants.

2. The Court further orders that each side shall bear its own fees and costs.

3. This judgment is final and disposes of all claims and all parties and shall be appealable.

4.  Pursuant to Fed. R. Civ. P. 58, the Court orders that the Clerk of Court shall enter judgment by separate document according to the terms outlined above.

5.  The Clerk of Court shall notify the parties of the making of this order.

DATED this 8th day of March, 2018.

Brian Morris
United States District Court Judge